## ROBERT TROUP,

### v.

## SAMUEL S. HAIGHT AND WIFE, JACOB LOWMAN, AND FRANCIS ERWIN.

The certificate of the acknowledgment of a mortgage, was, that " S. S. H. who is to me well known, personally appeared before me and acknowledged," &c : held a sufficient compliance with the act, though it did not set forth in terms that the mortgagor was " well known to the officer to be the person described in, and who executed the mortgage."

General usage, long continued and unquestioned, has great weight in the construction of this act, though such construction be not given upon adverse litigation.

More especially when that construction has been adopted by many law officers.

Accounts having been stated between the parties at different times, without fraud or coercion, and the statements being accompanied with written agreements showing how far they should be binding and for what cause they should be varied, the party was held to the terms of such written agreements ; and the accounts were opened so far only as the terms of those agreements extended.

And though one of those agreements made provision for the allowance of other items not embraced in the account, and the other for correcting the amounts of the items, to which allowances therefore the party is entitled, yet the former were not allowed by way of set off in this suit for a foreclosure of the mortgages.

But such other claims may be pursued by the parties respectively in other forms of proceeding.

The object of a suit for foreclosure is, to obtain satisfaction from the lands : and it is inconsistent with the nature of such a mortgage security to allow a set off.

And where such counter claims exist and are liquidated, the course of proceeding in equity requires that they should be presented by way of cross bill.

The accounts being sent back to the master for correction, upon the terms of one of the special agreements, the court would not impose on either party exclusively, the burden of proof.

THE complainant is chief agent for the sale and management of the Pultney estate, which is a tract of land heretofore purchased by Sir William Pultney, comprising a great part of the tract now constituting the counties of Ontario, Steuben, Allegany, Wayne, Yates, Monroe, and Livingston. In January, eighteen hundred and four, the defendant Haight was appointed by the complainant, a subagent for that part of the estate comprehending the counties of Steuben and Allegany ; and at that time he entered upon the duties of his office, and he continued to act as sole subagent for that department of the agency, until September, eighteen hundred and eleven, when Dugald Cameron was appointed by the complainant a joint subagent with him. Haight continued to act in the capacity of joint subagent

*1824.*
*23rd, 24th, 26th, 27th, August.*

*Account stated.*
*Set off.*
*Registry act.*
*Acknowledgment of deeds.*
*Foreclosure.*

with Cameron, until October, eighteen hundred and fourteen, when he was dismissed by the complainant.

After Haight's removal from the situation of subagent, an investigation of the accounts between him and the estate took place ; and on the 14th of March, eighteen hundred and fifteen, an account was stated, showing Haight to be indebted to the estate in the sum of D.2,587 $\frac{13}{100}$ : one hundred dollars of which he then paid, and for the security of the residue executed to the complainant a bond and a mortgage on certain premises in the village of Bath, bearing date that day.

Subsequently to this time it was discovered upon farther investigation, that Haight was still more indebted to the estate : and upon a settlement of accounts with him in August, eighteen hundred and fifteen, in relation to the claims then recently discovered, it was found, after deducting an account presented by him against the estate, that he was indebted in the farther sum of D.702 $\frac{66}{100}$ : for the security of which last sum he executed to the complainant another bond and a mortgage on other premises.

The bill was filed for the purpose of procuring the foreclosure of the two mortgages before mentioned. The defendant Sally, the wife of Haight, was made a party to the bill merely because she joined in the execution of the second mortgage ; and the defendants Lowman and Erwin, were made parties on account of transactions which took place after the execution of the first mortgage, in relation to the premises covered by it.

Upon the execution of the first mortgage, an agreement was entered into as follows :

" Whereas Samuel S. Haight hath executed to Robert " Troup a bond and mortgage, to secure the payment of the " sum of two thousand four hundred and eighty seven dollars " and thirteen cents, and lawful interest, &c. being a debt " owing by the said Samuel S. Haight to the Pultney estate " upon an account stated ; and whereas it is possible errors " may hereafter be discovered in undercharging and over- " charging in said account, it is agreed by said Robert " Troup, by Joseph Fellows his attorney, and by the said " Samuel S. Haight, that the taking of said bond shall be no

" bar to the correction of said account, by making all pro- " per additions to, or deductions from the same ; and it is " also agreed that the taking of said bond shall be no bar to " the just and lawful claims of the said Samuel S. Haight on " the said Pultney estate, or on the said Robert Troup, nor " to the just and lawful claims of the said Pultney estate, or " of the said Robert Troup, on the said Samuel S. Haight." Witness the hands and seals of the parties, &c.

At the settlement in August, eighteen hundred and fifteen, the following agreement is indorsed upon the account for which the second bond and mortgage were given :

" 1815, August 19. This account is referred to in an " agreement, bearing even date herewith, between the sub- " scribers. It is understood between the parties that this " account is not to preclude them respectively from demands " the one upon the other, in relation to other matters than " those within enumerated.

(Signed)    " ROBERT TROUP,<br>" SAMUEL S. HAIGHT."

Upon the execution of this second bond and mortgage, Haight transferred to Troup sundry other bonds, &c. as far- ther security for the balance which might be due.

The certificate of the acknowledgment of the first mort- gage, was in the following form : " State of New York, ss. " I, W. B. R. one of the masters in chancery in and for the " said state, do certify, that on this 20th day of March, A. D. " 1815, Samuel S. Haight, who is to me well known, per- " sonally appeared before me and acknowledged that he ex- " ecuted the within mortgage, for the uses and purposes " therein expressed. I do therefore allow it to be recorded.

" WILLIAM B. ROCHESTER."

After the execution of the first mortgage, the defendant Haight, being indebted to V. Matthews, and Matthews be- ing indebted to the defendant Lowman, an arrangement was made upon the application of Matthews to Haight, that the latter should execute to Lowman a bond and mortgage on the lands covered by Haight's first mortgage to Troup. Mat- thews stated his object to be to obtain payment of the debt due to himself, and at the same time to satisfy the debt he

1824.

TROUP
v.
HAIGHT.

owed Lowman ; and he proposed the arrangement in conse-
quence of discovering in the clerk's office, upon examination
of the registry of the first mortgage to Troup, the supposed
defect in the acknowledgment.   But he had no communi-
cation with Lowman upon the subject, and Lowman in his
answer denied fully and positively any notice of Troup's
mortgage.  ˙ Matthews also, as a witness, denied any know-
ledge of notice to Lowman.   But D. Cruger, attorney for
the Pultney estate, stated very particularly that Lowman ap-
plied to him for information of Haight's circumstances, be-
fore taking the mortgage, and that he, Cruger, advised him
of the former mortgage.   After the execution and acknow-
ledgment of the mortgage to Lowman, he sent it to Mat-
thews to be registered, and Matthews handed it to the clerk
for that purpose.

The defendant Haight insisted by his answer that the two
accounts were erroneous in several particulars ; among which
one item in the first account was a charge against him for a
note, called the Chapin note, which he then insisted was er-
roneous, and which afterwards proved to be so.   He also set
up an account against the complainant for services, expen-
ces, and allowances, in relation to the Pultney estate, to a
very considerable amount.   The testimony in relation to the
merits of the items of Haight's account, was very voluminous,
and the cause was argued at the hearing at great length.
The controversy had been the subject of much correspond-
ence and negotiation, and attempts had been made unsuc-
cessfully to terminate it by an arbitration referred to in the
argument.   These bonds and mortgages were, however, ex-
cepted from that reference.

In the subsequent sketch of the argument, many other
facts in the cause are merely alluded to, so far only as to
make the bearing of the arguments of counsel intelligible.

MR. TALCOTT, ATTORNEY GENERAL, for the complain-
ant, referred to the general doctrine, that except in special
cases, accounts stated shall not be set aside, unless for fraud,
or such undue advantage taken, as amounts to fraud ; nor
shall they be surcharged or falsified, but for error specified
in the pleadings, and proved. 9 Ves. 266. 2 Bro. c. c. 310.

Powel on Mortgages, 471. 14 Ves. 579. 6 Bro. P. C. 503. neither shall this be done except on very strong grounds; 5 Ves. 837. and it makes no difference, that the accounts are stated, with the exception of errors. 2 Bro. c. c. 311. note.

No such ground is here alleged. The defendant indeed says, that there are items in the account with which he ought not to be charged, and to which he objected at the time. But if a party will, with his eyes open, and without coercion or fraud, thus settle an account, he can not afterwards object to it here. So also in the case of a receipt. 1 Esp. 172, 3, 1 Campb. 393.

This applies to Haight. As to Lowman and Erwin, neither of them insist on, nor could be entitled to open the account. So, in Cases in ch. 299. where an account was settled between mortgagor and mortgagee, without fraud, the court would not open it at the suit of a second incumbrancer.

Here the defendant, being requested to assist in the statement of the account, declined to act : not only so, but in August following he concurred in stating another account for farther deficiencies, but without objection to the first ; and he has clothed the whole with peculiar solemnity, by giving mortgage securities. 1 Scho. & Lef. 192. And by the final submission to the award of Judge Platt, he ratified the adjustments a third time. The reservation in the first agreement can amount to no more than " errors excepted." That in the second relates wholly to matters not included in the account.

As to the claims of the defendant, not included in the accounts, we contend, that even if he had any such just claims, he could not set them off in this suit; but must bring them forward by cross bill. " A bill for a foreclosure is for a specific performance of the mortgage contract," and " it is peculiarly a suit in rem." 4 John. ch. 616. pr. Kent, c.

If the defendant can set up such claims, then the complainant must be allowed to meet them by counter claims ; else he may lose his security. And if the complainant may bring forward such counter claims, then the defendant on his part may be liable to be surprised by them ; for they will not have appeared from the bill ; and even not necessarily from the interrogatories.

But suppose such a course were pursued, and that a balance beyond the amount of the mortgage should be found due to the complainant ; will the form of the bill admit of a decree for such balance ? or if more were found due to the defendant than to satisfy the mortgage, could the court decree such surplus to him on these pleadings ?

And when a note was given for the balance of a partnership account, it was decreed, that it should be paid without reference to a balance arising on other transactions between the parties ; unless a second account of these last should also be stated. Preston v. Strutton, 1 Anst. 50. Such is the effect of the exception of these bonds and mortgages from the arbitration.

As to the sufficiency of the acknowledgment of the mortgage by Haight to complainant ; the terms of the act 36 sess. ch. 94. are, " that no such acknowledgment shall be taken " unless the officer taking the same shall know or have satis- " factory evidence, that the person making such acknowledg- " ment is the person described in, and who has executed such " deed, conveyance, or writing." The objection on the other side is, that the certificate does not say, in so many words, that the officer knew Haight to be " the person de- scribed in, and who executed the mortgage ;" and that there- fore the registry of it was wholly void ; and that the mort- gage to Lowman, being first regularly recorded, is to take the preference.

This statute, like every other, is to have a reasonable con- struction. It could not be intended, nor be possible, that the officer is in all cases to see the execution of the deed. And if that is not requisite, how is he to know, that the person ac- knowledging the deed, is the person executing it, except by that acknowledgment ? And if such acknowledgment is not sufficient proof that he is the person, then are not nine tenths of the acknowledgments irregular in point of fact, for want of actual knowledge by the officer that the deeds are executed by the persons who thus acknowledge? What then, on the con- struction contended for, would be the effect, if it should be found that the officer taking the acknowledgment had in re- ality no other knowledge that the grantor was the person de- scribed in, and who executed, &c. than that such person had the deed in possession ; that he was of the same name ; known

to the officer ; and solemnly acknowledged himself to be the persön who executed the instrument? If the defendant is right, it would seem that such proof might be given to overturn the acknowledgment.   Jackson v. Schoonmaker, 4 John. 161.   Jackson v. Humphrey, 1 John. 498.   Or if such proof would not overturn the certificate, then why is not the certificate sufficient, at least prima facie, and until evidence be given to impeach it, of which there is no pretence here ?

Optima interpres legum consuetudo.   And usage has been allowed great weight in cases, the same as this, or nearly allied to it.   " So extensive and deep rooted is the practice, that " many titles depend upon it, and it would be unpardonable " to disturb it now by a critical examination of the act ;" per Tilghman ch. j. in Farran v. Powers, 1 Serg. and Rowle 105.   "Practice and usage, as to acknowledgment of deeds, is received as an exposition of the act."   Per Marshall ch. j. U. S.   5 Cranch, 29. 32. 33.   " Consider also the usage and " transactions of mankind upon it.   The object of all laws " with regard to real property is quiet and repose."   Per lord Mansfield upon the stat. of Hen. 8. as to jointures, 2 Eden 74.

But the point has been recently and solemnly decided by our supreme court in Jackson ex dem. Merrit and Stanton v. Gumaer.*

Haight was described in the mortgage as " Samuel S. " Haight, of Bath, in the county of Steuben ;" and Mr. Rochester, the master who took his acknowledgment, and who resides in the same village, certified that on the 20th of March, 1815, " Samuel S. Haight, who was to him well known, per" sonally appeared and acknowledged that he executed the " mortgage," &c.   If this certificate does not contain the requisite evidence of the identity of the mortgagor, then the statute has been most strangely and unfortunately misconstrued from the very beginning of it; and that too by every officer of every rank and degree throughout the state.

The first statute requiring the officer to know or have satisfactory evidence of the identity of the grantor was passed in

---

* This decision was only referred to in general terms, the attorney general not having a note of it.   It is since reported in 2 Cow. 552.

32

1797, and the same language was used in the revised acts of 1801 and 1813. The fraud which the act intended to guard against, grew out of the speculations in the military lands, and the incessant and complicated traffic in those military titles. It consisted in one man personating and assuming the name of another, and the officer taking the proof or acknowledgment of deeds, never instituted any inquiry into the identity of the stranger who appeared before him. Under the present act the officer certifies to that identity, and cures the mischief that prevailed, when he declares that a person of the name of the grantor and to him known appeared before him. The end in view is entirely answered, and the fraud sufficiently prevented, if the officer knows the person appearing before him in his proper name, and assuming to be the grantor. There is then no room for mistake or imposition, except perhaps in the rare instance of there being two persons of the same name and description in all respects, and in such a case no form of words to be found in the act could prevent imposition. It would be one of those extraordinary and anomalous cases which are exceptions to all general rules, and such cases are not considered as forming a solid ground of interpretation of a general provision. The act had only in contemplation an ordinary mischief, and the conclusion seems to be irresistible, that when the master certified that Samuel S. Haight was to him " well " known," and that he appeared and acknowledged " the with- "in mortgage," it was certain to a reasonable intent that he was the same identical person described in and who had executed the mortgage.

It is objected that the certificate does not pursue the words of the act, and certify that the master knew Samuel S. Haight to be the person described in and who had executed the deed. But the act could not have intended that the officer who knew the grantor should know also that he had executed the deed. Strictly speaking he could not have that knowledge, unless he had previously been a witness to the execution of the deed. The only knowledge that the officer could be expected to have as to the fact that the person acknowledging the deed was the person who had executed it, was his knowledge of the person who appeared before him in his proper name,

and a name corresponding with that in the deed, and confessing himself to be the grantor. And this is all the certainty that in common reason ought to be required. Any thing beyond it would be too curious and excessive. The statute must have a practicable interpretation, and the intent and reason of it are satisfied when the officer is satisfied of the identity and certainty of the person assuming to be the grantor. The law must have intended to place some little confidence in the good sense and integrity of the officer in whom the trust is reposed. If he knows the person who acknowledges the deed, it means that he knows him in his character of grantor. It is to be observed that the act does not prescribe the form of the certificate. How it shall be drawn, must of necessity be left under some reasonable latitude to the judgment and discretion of the officer ; and in what way and form his knowledge is to be inserted in the certificate will inevitably afford some variety of construction in the variety of minds to whom that duty is intrusted. A very natural form of the certificate, when the officer acts upon his own knowledge would seem to be, that he knew the person who appeared as the grantor, and if he inserts that fact, it necessarily implies " all of which knowledge" referred to by the act, and it would be a very rigorous and violent construction to hold such a certificate useless and void, and not even sufficient to uphold the subsequent recognition of this certificate and the registry by the clerk.

One part of the act on this subject will illustrate the other. If the deed be not acknowledged, but proved by the subscribing witness, the officer is to " know the person making such proof, " or have satisfactory evidence that he is the subscribing wit- " ness." He is then to certify that he knows the person who appears as a witness; and will it not be sufficient to say that " A. " B. to him known appeared and testified" ? The act does not say that he shall know him to be the subscribing witness. It is sufficient that he " knew the person" who appears as the witness ; and yet the knowledge in the case of the witness, in order to guard against imposition, ought to be as precise and certain as in the case of the grantor. If he does not know the witness, then he is to have satisfactory evidence that he is " a subscribing witness." Here then, if we take the act literally,

1824.

TROUP
v.
HAIGHT.

the knowledge goes only to the person of the witness; but the proof goes farther, and reaches to the person of the subscribing witness. So again if the witness, whose identity shall have been thus known or ascertained, prove the deed, the officer must have satisfactory evidence that the witness knew the person who executed the deed. The act does not expressly require that he should know him to be the person described in the deed, but only that he should know the person who executed it; and yet it is very evident his knowledge to that whole extent must be intended and implied, in order to guard against a fraudulent personification. Unless we give to the words that sense, the danger of a fraudulent personification would still remain; for though the witness might know the person who executed the deed, he might at the same time know that he was not the person described in the deed.

We have alluded to these special provisions to show how unreasonable and how inconvenient it would be, to subject the certificates of acknowledgment or proof to a severe and hypercritical scrutiny. And if the officer is only required to know the person of the witness, without actually knowing that he was the subscribing witness, why is it not sufficient that he should know the person assuming to be the grantor without actually knowing that he was the person who executed the deed? The whole section must be read together, and one part construed by another, in respect to the personal knowledge of the grantor and of the witness. Such an interpretation ought to be given to each part, as to make the whole consistent in all its parts.

With respect to the knowledge of the person making the acknowledgment as being the one described in the deed, that knowledge is inevitably implied in a certificate stating that A. B. to him well known appeared and acknowledged that he had executed the within deed. The knowledge refers to him, as such grantor; and we cannot impute any other meaning to it, without admitting the certificate to have been fraudulently given. The substance of the statute is complied with and its object and policy are fulfilled, if the officer certifies his knowledge of the person coming before him as the grantor. A case of fraud may possibly happen even under such a certificate; but

it is not to be presumed, and is not likely to happen. The danger of fraud lies on the other side, and is infinitely increased, if, in a case in which the identity of the grantor was known to the officer, and when no possible doubt of that identity or of the truth and fairness of the case is pretended, the rights of a bona fide mortgagee can be superseded by a nice and subtle construction of the certificate. This very case shows the fraudulent abuse of such a construction. The registry is searched on purpose to see if the form of the certificate be not defective, and a new mortgage is given on purpose to defeat the prior one upon the pretext, that though Haight's identity was known to and certified by the master, the certificate did not go on and state something farther relative to the precision of that identity.

If the certificate in this case contained sufficient evidence of the officer's knowledge of the identity of the grantor according to the ordinary apprehension and the popular reading of the law, and sufficient to meet and avert the mischief which the statute had in contemplation, and of this we apprehend there can be no doubt, a more strict and severe construction would not only be unnecessary and highly inconvenient, but it would be attended with alarming consequences to the officers concerned in the transaction. The act is highly penal, for it makes " any neglect" of the officer taking, or of the clerk recording the deed, answerable in treble damages to the party injured by such neglect: and if the older mortgage of the plaintiff is to be postponed on the ground of a defect of the certificate, the master and probably the clerk would be chargeable with neglect of duty and be held responsible to the plaintiff for three times the value of the mortgage, on the supposition, and which the facts in the case will warrant, that the mortgaged premises would be exhausted by the mortgage of Lowman. This consideration must incline the court, if the question should even be deemed doubtful, to follow the obvious, the benign, and the received construction of the act.

We have said that the master's certificate in this case was conformable to usage and a generally received construction of the act, and the evidence of this fact is indubitable, and may be properly alluded to upon the argument, as resting upon matter of

record and upon a practice of public notoriety. Besides, the evidence of such a fact may be certified at the hearing and the certificates of the public officers relative to the proof and acknowledgment of deeds upon record, will be furnished to the court if the fact be questioned, or the evidence of it required. We aver then that it appears from the records in the secretary's office, and in several of the counties, and from the deeds and mortgages deposited with the comptroller, that numerous certificates of acknowledgment are in the same form with the one in controversy in this case, and if they vary in any degree, they nevertheless present the same objection in substance with that raised in this cause. It appears that there are for instance, ninety two outstanding mortgages in the secretary's office; and eighty six in the comptroller's office, with a similar certificate of acknowledgment with the one before us; and to adopt the rule of construction, for which the learned counsel for the defendants contends, would be to affect and invalidate the security of above one hundred thousand dollars owing to the people of this state. It will also appear by reference to those deeds and mortgages that among the officers who gave the certificates of acknowledgment in the cases inspected, there were the five judges of the supreme court and twenty nine masters and judges who were all of them lawyers by profession.

It appears further from an official statement from the registry office in the city of New York that the certificates are frequently in the form given by the master in this case, and liable to the same objection. Out of ninety seven volumes of deeds and fifty two volumes of mortgages, the register selected a few promiscuously, about fifty seven, of this character, and the inference was that they were very commonly so. The records of the counties of Oneida, Cayuga, Ontario and Steuben have also been inspected, and the certificates of the clerks prove the same interesting fact; and we are well warranted to infer that this has been quite a general practice and the received interpretation of the act from the year one thousand seven hundred and ninety seven down to this day. And if it were to be admitted, and which we do not admit, that the construction of the act, which we most confidently adopt, was not severely correct and analytically just, yet if ever a case

existed in which we might with propriety adopt the maxim that communis error facit jus, this is such a case. Indeed it is difficult to conceive a case in which the argumentum ab inconvenienti must press with more incumbent and distressing weight than it does in this case against the new and subtle construction which the counsel for the defendants have thought proper to adopt. The forms of the certificates upon record show that we have here a contemporaneous and continued interpretation by the officers of the government through every degree of subordination, in favor of the construction for which we contend; and this interpretation derives the utmost force and authority from that usage.

The case of Webster v. Hall, 2d Harris and McHenry's rep. 19, decided first in the general court and then in the court of appeals of Maryland, may be cited in addition to those authorities already referred to as bearing very much upon the present case. By the statute law of that state a feme covert, in order to convey, must be privately examined out of the hearing of her husband, and the certificate was that she had been privately examined, omitting the other words. An objection being taken to the sufficiency of the certificate, the same was discussed and overruled; for privately, implied that she was solely and secretly examined, and verba intentioni debent inservire.

Unless we utterly deceive ourselves, the argument in favor of the validity of the certificate is perfectly conclusive.

But even granting that the acknowledgment was not well taken or certified, we still contend that Lowman had actual personal notice of the mortgage to Troup, which is sufficient to uphold the priority of the latter security. 19 John. 281. 10 John. 461. 2 John. ch. 603. 2 Vern. 574. 609. 3 Mer. 210. 1 Mer. 356. 3 Atk. 646. Powel on mort. ch. 8. p. 287, 8, 9.

Or, if he had not personal notice, Matthews is to be deemed his agent in respect to this mortgage; and the knowledge which Matthews had, affects Lowman. 2 Vern. 609. Neither does Lowman deny notice to his agent. Such partial denial is but a negative pregnant. 3 Atkins. 649.

It is admitted that we prove this notice by one witness only, Cruger, against the positive denial of the defendant Lowman.

1824.

TROUP
v
HAIGHT.

But we contend that there are such circumstances as will give his answer a preponderance over the denial of that defendant. The rules on this subject are referred to in 6 Vesey, 185. and 2 John. ch. 92, 3.

Some years have elapsed since the transaction. Lowman's answer is but a general negative. Cruger was attorney for the Pultney estate. He was applied to particularly by Lowman for information of Haight's means to secure a debt; and he swears to transactions in which he had a principal agency.

There is much weight in the observation that the direct and positive testimony of Cruger, stating that he gave personal notice of the mortgage to Lowman, and detailing the special circumstances under which he gave it, far outweighs in the scale of evidence the general negative denial of notice by Lowman. It is impossible that Cruger could have been mistaken as to a fact so circumstantially stated, and so positively and affirmatively averred, and yet it is very possible that the same fact may have escaped the recollection of Lowman, and led him to confound the prior with the subsequent notice. But we forbear to press this point though we have no doubt that Lowman had actual personal notice of the plaintiff's mortgage. It is certain that Matthews had such notice, and that he afterwards assumed to act as the agent of Lowman in procuring the second mortgage to be executed, accepted, and registered. He searched the records, and discovered the alleged defect for the avowed purpose of procuring such subsequent mortgage to defeat the plaintiff's lien, and in this respect he voluntarily assumed to act in the first instance as such agent. He then advised Haight to execute the mortgage, and by letter he advised Lowman to accept of it; and when the mortgage was given and accepted in pursuance of this advice, the acceptance of the mortgage was a recognition of the agency; and this recognition was farther confirmed by employing Matthews to have it registered.

It is a well established rule in equity that notice of a particular fact to an agent, is notice of that fact to his principal. About this rule there is no dispute; and if the agency of Matthews can be established, the conclusion of law follows of

course, and the older mortgage of the plaintiff would on that ground be entitled to retain its preference.

Matthews was most clearly the efficient instrument in pro-curing Lowman's mortgage. He searches the records : he advises Haight to give, and he advises Lowman to accept. Without his officious interference the act would not have been done ; and Lowman employs him to have the validity of the lien consummated by the registry. This last act was essential to give him any claim to priority. There could have been no pretence of any lien as against the prior encumbrance without it. This is not the case of merely accepting a mortgage upon another's advice. No other person had here previously done an overt act on behalf of Lowman, by searching the records, and founding his advice upon the discovery he had made. Lowman then employs Matthews to procure the lien to be fastened upon the estate. Was not this a virtual and essential recognition of his agency from the beginning ? The lien had no existence until his agency in consequence of that employment had procured the registry. Matthews was in truth the sole actor, in the transaction ; and whatever was done for the benefit of Lowman was done by means of his agency ; Lowman was but a passive instrument, implicitly following his advice and asking his aid to consummate what he had begun. The doctrine of notice to the agent applies with the clearest justice and equity to this case, and the principal ought not to reap securely the benefit of a transaction procured for him by the fraudulent agency of another. The court will be disposed to give due effect to the doctrine of agency in this case, in order to uphold the undoubtedly superior equity of the title of the plaintiff, and to defeat a premeditated scheme to subvert that title.

We conclude therefore with great deference and submission to the judgment of the court, but with entire confidence, that upon the whole view of the case, the plaintiff will be found to have a well grounded title to the usual decree of foreclosure and sale.

MR. ELISHA WILLIAMS and MR. COLLIER for the defendants.

The complainant comes into this court, asking equity. That equity he ought not to have, except upon terms of correcting the manifest and important errors in these accounts.

The accounts were made up when the defendant, as he then informed the complainant's agents, had not time to attend to them. They are ex parte, and consist of a debtor side only.

The agreement of March 1815 contained, as stated by a principal witness, "the understanding of the parties at the time." It is a solemn and guarded transaction, manifestly intended to protect the party, and can never be turned into an unmeaning formality, as the argument on the other side would make it. For if so the charge of the Chapin note, since admitted to be an error, could only be corrected as a matter of grace and favor.

The cases cited by the attorney general are principally cases of unreserved settlements, or of bills against defendants as bailiffs, trustees, &c. where the court adopt rules to save them from the necessity of reaccounting. But even then all errors specifically shown are corrected of course in this court; and if material errors appear, the party will often be held to reaccount. The plain intent of the covenant subjoined to this account was to take the case out of the rules regarding accounts stated, and to save to the party the same right to contest the items as if the bond and mortgage had not been given. For as to correcting mistakes, the defendant would have that right without the covenant.

But the argument on the other side, is, that the covenant amounts to no more than " errors excepted," and then they cite Johnson v. Curtis to show that " errors excepted" amounts to nothing.

It was even suggested that the covenant affords an additional reason against opening the account at all. Was this then truly the object of that covenant? Did the parties seek to guard against a reexamination? It is not however the particular items of the account which were made subject to alteration. It was the account itself at large. And if this was so, nothing has since been done to waive the defendant's rights.

The discussion of those rights is properly reserved to the time when the complainant comes to enforce his demand.

In the settlement of August 1815, there was no express agreement for a revision of the account. Will the counsel consent that we reverse their argument, and say that this is the same thing as if " errors excepted" had been added ? and that if added the words would have been equivalent to the terms of the first covenant ?

The cases cited against us, are either on bills for an account where the defendant has pleaded an account stated ; or they are cases where the complainant has sought for the correction of an account. The first of these classes of cases is clearly distinguishable from the present : to open the account would throw the whole weight of proof upon a defendant who has once rendered his account, and would compel him to account de novo, which the court will not require, unless the plaintiff will point out some specific errors. In the second class of cases, the court will require more rigid proof, where the complainant seeks to open an account admitted to have been stated, than will be required here, where the complainant comes for the ordinary remedy, on a mortgage which the defendant says is made for more than the just amount of the debt.

But even in the other cases cited, either error or fraud will be sufficient ; and the rule only requires, where an account is proved to be settled, that some specific objection be pointed out. Mit. pl. 208. 1 Mad. ch. 81. 82. Ed. of 1817.

If the defendant plead a stated account, he must annex it by way of schedule ; that the plaintiff may have an opportunity of pointing out errors ; and the plea must aver, that the account is true, to the best of the defendant's knowledge. Mit. pl. 211.

If an account be settled under a mistake equity will relieve. 1 Mad. ch. 66.

A verbal statement of an account, and a receipt in full for the balance, are no bar to a bill for opening the account, if there be any mistake in the transaction.

Upon an account stated between mortgagor and the heir of mortgagee, upon proof that it was agreed, that the account should be reviewed, if there was any mistake, and that interest

upon interest was computed, a new account ab origine was decreed.   Com. dig. chancery, 2 A. 1. 2. 3.; and see 3 ch. ca. 18.

After an account stated, a man shall be obliged to give an account de novo, upon showing particulars in which the account was mistaken. Ib.   But he ought to show in what particulars it is mistaken; and upon a bill for an account, the court will not open the account in the sense of this term, so as to compel an account de novo, without the errors are specifically pointed out and proved :  but even then it is almost a matter of course to give liberty to the party who points out the errors, so that the defendant is apprised by the pleadings of the specific errors relied upon, to surcharge and falsify. Ib.   For then the onus is on the party having that liberty ; for the court takes it as a stated account and establishes it ; but if any of the parties can show an omission, for which credit ought to be, that is a surcharge ; or if any thing is inserted that is a wrong charge, he is at liberty to show that ; and that is a falsification. 1 Mad. 83.   2 Vesey, 566.   2 John. ch. 210.

An account stated ten years before, containing very gross charges, was not allowed to be opened ; but plaintiff was permitted to surcharge and falsify.   2 Brown c. c. 62.   And where defendant suggested, but did not prove, a settled account, leave was given by the decree to surcharge and falsify, if the master should find any settled account.   1 Mad. 83. Here no specific error was pointed out.

We suppose then that under the covenant in relation to the first account, the errors being specifically pointed out, and particularly if color is given to the allegations of Haight by very slight proof, and any error is proved, that the whole account will be opened, and that the burden of proof will be thrown upon the plaintiff.

The first bond and mortgage was only intended to secure any supposed balance which the plaintiff claimed.

And we contend that in relation to the second account, leave should be given to the defendant to surcharge and falsify before the master, as to all the items specified in the answer.

It is not necessary to make full proof of the errors at the hearing.   The court will not go into that detail, which more properly belongs to the master ; to whom it would not be ne-

cessary to refer the accounts, if the court had already decided on them. This court will examine so far only as to determine whether the defendant ought to account anew.

The testimony shows that errors are not only pointed out but proved.

It is argued, without being proved, that Haight acted with his eyes open, and ratified the account. But in the most unreserved settlements of accounts, it is not an insurmountable barrier to the correction of errors, that the party has given securities for the balance.

If a party, with full knowledge of the case, will pay money not due, or give a bond for it, neither a court of law nor equity will relieve him. But neither will a court of equity enforce a bond if involuntary, or if given under fraud or mistake. And here the covenant required by Haight shows, that he did not intend to bind himself unreservedly.

As to the credits claimed by the defendant Haight. It is in proof that he stated at the time that he had claims against the plaintiff or the estate, which he reserved for adjustment with the plaintiff personally.

This brings us to the consideration of the claims or demands of Haight against the plaintiff, stated by way of set off against the bonds and mortgages of the plaintiff: and first as to the right of set off in such cases we observe:

That our statute of set off is more comprehensive than the English. The English statute only authorises a set off in cases of " mutual debts" : and the construction given to that statute in their courts of law is, that to entitle the defendant to set off his demands, they must be certain and liquidated. The words made use of in the English bankrupt law are " mutual " debts and mutual credits." But our statute, 1 rev. laws 515, authorises a set off, where two or more persons, dealing together, be indebted to each other, or have demands arising on contract or credits against each other.

The English authorities are therefore not applicable ; for it is evident that our legislature intended to extend the rule ; particularly when we recollect that the words in our statute " or " have demands arising on contract" were not contained in the act of 1801, 1 rev. laws of 1801. 346, but are added for the first time in the revision of 1813. 18 John. 156. note (a.)

If then the plaintiff had sued Haight at law, he could set off his demand ; and surely the plaintiff ought not, by filing his bill in equity, to deprive Haight of this right.

It is said that a court of equity will grant relief in any case where there is an equitable, without a legal right, to set off. Montague on set off, 61.    2 Mad. ch. 512.    5 Vesey, 108. 3 Meriv. 618.

But it is objected in this case that a bill for a foreclosure is a suit in rem : and that a defendant cannot be permitted by his answer to change the nature of the suit into a proceeding for a general account, or inquire as to other demands, &c.

It is true the Chancellor has said in the case cited from 4 John. that a bill for a foreclosure is for a specific performance of the mortgage contract, and is a proceeding in rem ; and so such a bill is.    But his Honor could not intend to say that the answer might not present other and different questions ; that it might not set up a legal or equitable set off, or any other defence ; or set forth any other reason why the particular remedy sought for by the plaintiff's bill, should be denied him, unless he should first do equity.    The maxim that he who seeks equity must do equity, is applied as well to a mortgagee, seeking in this court to foreclose his mortgage, as to every other suitor.    Com. dig. chancery, 3 F. 3.

Though a mortgagee be of right entitled to a decree for foreclosure, after the estate becomes forfeited, if he act fairly ; yet if there be any injustice in the case, the court may refuse such decree.    Powel on m. 1046. cit. 2 Vern. 271.

Suppose the mortgagor had an account or demand against the mortgagee, arising on contract, sufficient to satisfy the mortgage debt, and the mortgagee, instead of suing at law, where the mortgagor would be entitled by the statute to his set off, should file his bill in chancery for a foreclosure, could not the defendant avail himself of his set off, and have his just demand applied upon the bond ? Would it be a sufficient objection to say in such a case that the plaintiff's bill was for a specific performance of the mortgage contract ; that it was a suit in rem ; and that the court would take cognizance of nothing else ? If it be so, then we see that in a case of every day's occurrence, the mortgagee might, by filing his bill, de-

prive the mortgagor of a legal and statute right, and get the aid of a court of equity to effect the most gross and manifest injustice.

But it is said that we can not set up these claims by answer merely, without filing a cross bill. But where is the objection? Why can not the court as well take cognizance of the subject matter, when presented by the answer, as if it was detailed in a new bill? And we ask farther, how would a cross bill help us, if this bill is altogether a suit in rem; and the court will not look beyond the mortgaged premises, or take cognizance of any thing else?

But let us inquire a little farther as to the necessity and object of a cross bill.

Barton says, " there is still another species of defence which it is sometimes necessary for a defendant to resort to; as where the defendant is unable to make a complete defence to the plaintiff's bill without the possession of some facts which rest in the knowledge of the plaintiff himself or some codefendant, it may become expedient, for the purpose of procuring such discovery, to exhibit a cross bill against the plaintiff or such codefendant." Bart. eq. 121, 2.

A cross bill is brought by the defendant against the plaintiff in a former bill depending, touching the matter of such bill, or the facts set forth in the answer. 1 Har. pr. 135, 6. It is in the nature of a defence; a proceeding to determine a matter already in litigation; a right or remedy given to the party defendant who wishes the opportunity of appealing to the conscience of the plaintiff, and requiring his answer under oath, as to the matter in issue: but this is an advantage we are willing to forego in this particular case; nor ought the defendant to be driven against his wishes to a proceeding which would make the plaintiff a witness in his own favor, and compel us to take his answer for true, or disprove what he should allege therein by two witnesses, so far at least, as he should deny the allegations in the bill.

As it regards the objection and argument of the attorney general, that the plaintiff would be entitled to set up any counter claims he may have against the demands of the mortgagor, and the difficulties he suggests upon that subject, we answer.

that his principal objection may be made with equal propriety to a set off in a court of law. Suppose the mortgagee sues on the bond alone at law. Would not the mortgagor be entitled in such suit to set off all the demands " arising upon contract" he may have against the mortgagee ? And could the mortgagor in such case set up against the demands of the defendant in the suit his counter claims against him ? Most clearly he could not, under the pleadings in the case supposed. And neither can he in a court of equity. If a complainant has counter claims, and is apprised by the defendant's answer, that he claims a set off, the plaintiff would be compelled to file a supplemental bill, if his first bill was not sufficient to comprehend them.

And indeed the argument of the attorney general on this subject, applies, as we understand it, and with equal force to all cases of set off, and would take from a court of equity their entire jurisdiction in relation to set off, which it has been heretofore supposed to possess to a greater extent than a court of law.

But there are several special reasons in this case why the defendant should be entitled to set off his demand if any he has.

I. The claims set up in the answer are between the same parties. The plaintiff acting in the same representative character, and the demands growing out of the same subject matter.

II. The remedy of Haight in a court of law to recover his demands would be attended with insuperable difficulties : for,

1st. The plaintiff acting in the character of agent only, would not be personally liable. No suit therefore could be maintained against him.

2d. The principals reside abroad beyond the jurisdiction of the court.

3d. During Haight's agency there were several and repeated changes in the title. The estate is distributed into different funds. Some of it is real, and some personal. And each fund, by death or otherwise, has gone into the hands of different trustees, heirs, devisees, administrators, &c., all residing abroad, so as to render it perfectly impracticable for the de-

fendant to pursue his remedy against them ; laws of 37 sess. ch. 14. And were they all here, it would require a multiplicity of suits, and it would be impossible to ascertain the respective proportions which the different parties ought to pay.

4th. The claims of Haight would be barred by the statute of limitations ; which could be pleaded against him at law. Nor would the circumstance of Haight's litigating his claims before the arbitrator, and since then in this court, be sufficient to take his case out of the statute.

5th. Defendant would be met with the same objections growing out of the settlements, &c. now urged against him here, and which could be urged with much greater force and propriety in a court of law.

III. Lowman being a mortgagee for a valuable consideration and as we say a bona fide mortgagee, without notice ; is entitled to the benefit of the set off. If his mortgage is postponed to plaintiff's, the just claims of Haight ought to be applied to the payment of the bond ; nor is it necessary that he, Lowman, should specifically ask it in his answer. He appears before the court in the character of a bona fide mortgagee, and the court will see that his rights are protected, particularly when Haight having an interest in the subject, asks to have the set off thus applied.

The counsel here went into a very detailed examination of the items of the account claimed by Haight which were numerous and complicated. They insisted however that probable grounds for establishing those items were sufficient to open the accounts.

The next point made on behalf of the defendants or rather on behalf of Lowman, is that the certificate of acknowledgment of the plaintiff's first mortgage is defective, and the mortgage not being therefore duly registered within the meaning of the statute, it ought to be postponed to Lowman's mortgage, he being a subsequent bona fide mortgagee without notice, and his mortgage being first duly registered.

The point seems to be conceded that an unauthorised registry of a mortgage will not operate as a constructive notice to a subsequent purchaser or mortgagee. 1 John. ch. 300, 3 Cranch 155. Sugd. 470. 4 Binney, 204.

34

That Lowman's mortgage is duly registered, appears from the exemplification thereof now produced, regular notice having been given that it would be read at the hearing.

The statute provides that no acknowledgment shall be taken unless the officer taking the same, shall know or have satisfactory evidence that the person making such acknowledgment, " is the person described in and who has executed such " deed," and all of which shall be inserted in the said certificate of such acknowledgment. We observe in the first place that this proof is altogether ex parte, that the liberty of proving a deed before any one of the multitude of acknowledging officers scattered throughout the state, without notice to the parties interested in, or claiming title to the premises, is a very high privilege; as the parties in interest have no opportunity of seeing the grantor, cross examining the witnesses, or inspecting the deed; and the grantee has it in his power to place his deed on record, and put the original in his pocket or destroy it, and rely upon an exemplification, and certainly ought to bring himself strictly within the provisions of the statute. We do not mean to say that the very letter of the law should in all cases be complied with; but most certainly the officer should be required to certify in substance, to every thing that the legislature have required. 4 Binney, 204.

Now, have the legislature required any thing more than that the officer should know the person making the acknowledgment? they have; they have required not merely that he should know him, but that he should know him to be the person described in and who has executed the deed : then most clearly the officer should give us evidence in his certificate in substance that he knew him to be the grantor. The old act of 1798, the court will recollect, was not thus specially guarded, and the multiplied frauds committed, particularly upon the military tract, in personating the grantor, or the soldiers, in whom the title was vested, rendered it necessary to pass a new statute upon the subject, and a new statute was passed, adding these special provisions, which have been retained in all the subsequent revisions of the laws.

The acknowledging officer may know the person appearing before him not to be the grantor, and yet give this certificate

and certify truly to all that this certificate contains. Suppose some other person bearing the same name, whom the officer personally knows, appears before him, and makes the acknowledgment, he may certify to every thing contained in this certificate, or suppose that such a person bearing the same name, should add a false description of his place of residence business or profession, &c. and actually execute the deed, he may acknowledge it with impunity, and an officer knowing him personally, but knowing that he is not the person described in the deed, may take the acknowledgment in this form.

If the words "who is to me well known," were stricken out of this acknowledgment, no one would pretend that such an acknowledgment would entitle the deed to be recorded or read in evidence. All the old certificates of acknowledgments were in that form, and yet does such a certificate clearly imply all that is expressed in this case. For in the case put it might be argued with great propriety that the acknowledging officer could not certify that S. S. Haight appeared before him, unless he knew him to be S. S. Haight.

The acknowledgment in this case implies that the officer knew the person appearing before him to bear the name of Samuel S. Haight, but upon the important point whether he knew him to be the grantor, or the person described in, or who had executed the deed, the certificate is silent.

It is said by the attorney general that this ought to be received as prima facia evidence, as there is in this case, "no pretence of a question as to the identity;" but this is a question of strict law, between two persons having equal equity; a question whether the doctrine of constructive notice shall be extended to a case where the party does not come clearly within the statute. And the court will not make a rule for this particular case, but is called upon to give a construction to this act, which is to be applied to all cases arising under it, and in this point of view the question is very important.

We do apprehend that a decision giving effect to such a loose certificate would be a most dangerous precedent, and would be virtually repealing a most salutary provision in the statute, proved by experience under less guarded terms of the

1824.

Troup
v.
Haight.

former law, to be proper and necessary; and although the construction we contend for will operate as a hardship upon the plaintiff, yet it will be recollected that Lowman being a bona fide mortgagee, and for a just debt without notice of plaintiff's mortgage, has a right to claim the protection which the due registry of his mortgage gives him under the statute.

We have not seen the certificates from the clerks of Ontario, &c. but however such certificates may be multiplied, they would not be deemed sufficient to do away the positive provisions of the statute. If the statute in truth requires more than these certificates contain, nothing will legalize them but express legislative provision. As to the opinion of the late chief justice Spencer, there is reason to believe that he has no settled opinion upon the subject; since this bill was filed this very question has been raised before him at three different circuits. In one case at least he thought the objection well taken. We think therefore that nothing can be drawn from the case cited to show that the opinion of that distinguished judge is against us on this point.

But it is said that Lowman is chargeable with notice in fact. 1. That he had personal notice of plaintiff's prior mortgage. 2. That Matthews who had notice was his agent. It is conceded that if either of these positions be maintained by proof it would be sufficient to give the plaintiff the priority.

On the question of notice to Lowman of Troup's mortgage, there is nothing to entitle the witness Cruger to peculiar credit; and his connection with one of the parties exposes him to peculiar biasses. The denial of Lowman is very full. The proof by Cruger does not go, as is pretended on the other side, to show that notice to Matthews which Lowman could not deny; but it goes to prove notice to Lowman himself; and so it is directly opposed to the answer, and standing alone, is overbalanced by it.

The case cited from 3 Atkins. has no application here. The notice there relied on was notice to the agent.

Mere suspicion of notice is not enough to break in upon the registry act. It must be fraud, or clear and undoubted notice. 8 John. 137. 141. 2 Mass. rep. 506. Sugden, 490. Powell on mort. 566. 569. 577, 8.

Neither was Matthews an agent for Lowman. He owed Lowman, and Haight owed him. He advised Haight to give, and Lowman to accept the mortgage. But he takes not a step as agent. There was neither previous appointment nor subsequent assent. Lowman was ignorant of all that passed between Haight and Matthews; and he accepted of the mortgage personally and not by any agent.

Suppose Haight had mortgaged to Matthews, and he to Lowman; could it be said that notice to Matthews, should postpone Lowman's lien ? Yet this was in effect the state of the fact ; and see 8 John. 137. 10 John 197.

" But Lowman sent back the mortgage to Matthews to " have it recorded, and this made him agent." When agent, and for what purpose ? only to hand the mortgage to the clerk, after it was executed and acknowledged.

Suppose then that after the execution and acknowledgment Lowman had received personal notice of the complainant's mortgage ; would that have taken away his priority? We conceive not. If received bona fide, preference will be given to the mortgage first duly registered. Lowman could not be bound by notice to one not yet constituted his agent. And Matthews was made agent for the special purpose only of handing the mortgage to the clerk ; and at a time when personal notice to Lowman would have been unavailing.

The case of Jennings v. Moore and another is not applicable. Here Matthews was not acting for Lowman in procuring the mortgage, but for himself. His object was to get payment from Haight. His agency for Lowman did not commence until after that object was secured.

The court is not inclined to extend the doctrine of constructive notices : and notice to an agent must in order to affect a principal be notice to one empowered to act, and not merely to treat. Com. dig. chancery 4 C. 5. 6.

The reply was very elaborate ; but so much of it as was practicable has been incorporated with the opening.

It was observed that the complainant does not come into this court for any such peculiar favor as will entitle the court to impose conditions. The remedy asked for is as much a matter of right as an action at law.

1824.

Troup
v.
Haight.

It is objected that one class of our cases is of those in which a plaintiff comes into a court to correct an account which he admits to have been stated; and the principle of these cases is said not to apply. But here the defendant, Haight, offers that same defence. Can there be a different rule when offered by plaintiff or defendant?

The argument on the other side confounds the opening of an account for mere mistake, and the opening of it for an account de novo. The former is allowed in every case of mistakes proved, and to that extent, and no farther. The latter is not allowed for mere specific mistakes, but on the ground of fraud or imposition only. Barrow v. Rhinelander, 1 John. ch. 550.

The reference to a master to take accounts with leave to surcharge and falsify can only be directed by the Chancellor for errors alleged and proved. He can not therefore give such direction, until he has heard the proofs and acted on them. There is no such rule as to give that direction upon suggestion, or upon slight proofs. · Such a rule would be most arbitrary and dangerous.

In respect to our statute of set off, it has been determined at law to be no more extensive than the former act, and to embrace only demands or credits which are liquidated. This was so decided by the supreme court, in Holcomb v. Maurice, M. S. May 1816. The case is not fully reported, but referred to by Mr. Anthon in his nisi prius cases, 149. [A copy of the case made was laid before the Chancellor.]

The rule as to set off is the same at law and in equity. 3 John. ch. 358. 4 John. ch. 292. But the jurisdiction of the lord chancellor in bankruptcies in England stands on different ground and is to be carefully distinguished. So also bills for an account are different in principle.

If Haight had any just demands against the complainant, the necessity of presenting them by way of cross bill is aptly illustrated by the case of a bill for specific performance. This bill is for the specific performance of a mortgage contract; and the defence is in the nature of a claim to have the mortgage given up; which should be presented by cross bill. 2 Atk. 133. 2 Mad. 327.

THE CHANCELLOR. The mortgage of the lands in Bath, from Haight to Troup, was executed on the fourteenth day of March, 1815, and was registered on the thirty first day of that month.

The mortgage of the same lands from Haight to Lowman, was executed on the sixteenth day of February, 1820, and was duly registered on the twenty fourth day of February, 1820.

If the mortgage to Troup was duly registered, it has preference to the mortgage to Lowman ; but it is insisted by Lowman, that the mortgage to Troup was not legally registered.

The certificate of acknowledgment upon which the mortgage to Troup was registered, states, that Samuel S. Haight well known to the officer who took the acknowledgment, personally appeared before him, and acknowledged that he executed the mortgage, for the uses and purposes expressed in it. The objection made to this certificate is, that it does not state, that Haight was the person described in and who had executed the mortgage deed. This certificate is not in the terms of the act concerning deeds ; and it is urged, that the terms of the statute, or others fully equivalent, must be used in every certificate of the acknowledgment of a deed. The complainant insists, that this certificate though not expressed in the words of the statute, is a substantial and sufficient compliance with the sense of its provisions.

The statute is susceptible of either of the different constructions which are now urged ; and each of these constructions, is supported by arguments of great weight. If this were an original question upon a new statute it would present difficulty ; but I do not think myself at liberty, to treat it as an undecided question. From the first enactment of this provision concerning the acknowledgment of deeds, in 1797, until this time, certificates of acknowledgment have been made in different forms, and have been expressed in various terms. The most usual form has I believe, been that which adopts the language of the statute ; but various other forms have been used ; and certificates expressed in the language used in this instance, have certainly been very usual in all parts of

1824.

TROUP
v.
HAIGHT.
6th Oct.

1824.

Troup
v.
Haight.

Construction by
many law offi-
cers.

General usage,
long continued
and unquestion-
ed, has great
weight in the
construction of
the act, though
such construction
be not given upon
adverse litigation.

Accounts volun-
tarily stated with-
out fraud, &c. not
opened.

And limited by
special agree-
ments.

the state. Certificates like this, have been considered and treated as sufficient, during twenty seven years; and a decision that they are not valid, would subvert titles to lands, to a very serious extent. They have been held sufficient, not merely by the recording officers, but by judicial officers who have taken acknowledgments and have composed their certificates in this form; by judges of the supreme court, judges of the county courts, masters of this court and commissioners. This general usage thus long continued and hitherto unquestioned, has great force; and the practical construction of the law by so many public officers, though not given upon adverse litigation, must still have much of the weight of judicial decision. The construction which considers these certificates as a substantial compliance with the law, is liberal, but it is not violent or unreasonable. This construction has prevailed so extensively and for so long a period, that it possesses high authority; and to pronounce these certificates void, would be a most dangerous innovation. I shall therefore, in pursuance of the received interpretation of this law, consider the certificate upon which the mortgage to Troup was registered, as sufficient, and the mortgage as duly registered.

The two settlements made between the complainant and Haight, the bonds, the mortgages and the special agreements, were the voluntary acts of the parties; and all these acts were wholly free from fraud or coercion. The two accounts having been freely and fairly adjusted by the parties, this case affords none of those reasons, upon which courts of equity vacate securities or open settled accounts.

This case is not only free from coercion or fraud, but the special agreements made between the parties upon the two settlements, show clearly, their own sense and intentions, in respect to the extent and effect of these settlements. They show the rights which were adjusted and relinquished by those settlements, and likewise, the rights which were reserved by the parties.

When the first account between Troup and Haight, was settled and the first mortgage was given, a written agreement concerning the extent and effect of the settlement then made, was executed between the parties. This special agreement

recites, that the mortgage was given for a debt due from Haight to the Pulteney estate, upon an account stated; and that errors might be discovered in undercharging and in overcharging in that account. The agreement then stipulates, that errors in the account, may be corrected, notwithstanding the bond and mortgage.

One great object of this agreement, evidently was, to determine how far the settlement then made should be conclusive, and how far it should be open to reexamination. By this agreement, the parties determined for themselves, the extent of their own rights, in respect to a reexamination of this account; and their rights in this respect, now rest entirely upon this contract.

This account is accordingly open to correction: and the sense of the contract is, not that any new charge or credit may be introduced into the account, but that any of the items of the account, may be varied in amount, or may be totally rejected. Each party is therefore, now entitled to show any error or errors in this account.

The next stipulation of this agreement, is, that the bond shall be no bar to the just claims of either party against the other. This reservation obviously relates to demands not comprised in the account.

This agreement thus provides for two distinct objects. First, that errors in the account may be rectified, and next, that demands not comprised in the account, shall not be barred by the settlement.

The written agreement made between these parties when the second account was settled and the second mortgage was given, declares that this account is not to preclude the parties respectively, from demands upon each other, in relation to other matters. But this agreement does not reserve any right to open or reexamine this second account or the second bond and mortgage.

Both these agreements thus reserve to the parties respectively, all claims which each of them may have against the other; excepting those embraced in the two settled accounts. All claims not comprised in the two accounts, are excepted from these settlements: but these agreements do not stipulate,

35

1824.

Troup
v.
Haight.

The claims reserved in the settlements, must be pursued by a separate remedy.

that Haight shall be entitled to set off his other claims upon Troup, against these bonds and mortgages. It is not the sense of these agreements, that the claims of Haight which were not included in the two settled accounts, should be set up against the mortgages; but the meaning of those stipulations concerning other claims, seems clearly to be, that such other claims may be pursued by either party against the other, without any bar or presumption of satisfaction, arising from the settlements, the bonds and the mortgages.

But if these agreements do not give to Haight the right to set off his other claims, upon Troup, in this suit, it is insisted, that such a set off may be made, upon general principles of law and equity.

The object of this suit, is, to foreclose the equity of redemption and to obtain satisfaction of the two mortgages, from the mortgaged lands. The suit is in effect, against the land: and it seems inconsistent with the nature of the mortgage security, that such a set off should be made. A mortgage being a specific incumbrance, and the object of such a suit being to foreclose the estate of the mortgagor if he will not redeem, or to obtain satisfaction by a sale of the land, it seems to follow, that the general law of set off is not applicable in such a suit.

In this case, many of the counter claims of Haight against Troup, are unliquidated and uncertain in their nature and amount.

They may be the subject of a cross bill.

If demands wholly distinct from the mortgage debt, can be set off in a suit to foreclose, the course of proceedings in equity seems to require, that such counter demands should be presented by a cross bill.

But can not be set off.

But without discussing these questions, the agreements and acts of the parties in this case, sufficiently decide, that Haight's counter claims against Troup, can not be set off against these mortgages. These claims existed as they now exist, when the two settlements were made: but the bonds and the mortgages were nevertheless given as securities for the debts ascertained by the adjustments of the two accounts. They were given and intended as securities for particular debts; and they were separated from the other demands of the par-

ties, not only by the nature of the securities themselves, but also by the express contracts of the parties. The rights expressly reserved by the parties, were the right to correct errors in the first account, and the right to pursue all claims not embraced in the two accounts. The evident sense of these transactions and contracts, is, that while the claims of Haight against Troup, not comprised in the two accounts, might be enforced, they should not be set up to defeat or diminish the securities given for the particular debts ascertained by the settlements. To open these mortgages to a full examination of all Haight's claims against Troup, would manifestly contravene the acts and agreements of the parties. To decide this, would be to decide, that the settlements made by these parties have no effect, as adjustments of the demands comprised in the two accounts; and that mortgages given to secure particular debts, shall operate only to secure a balance arising from all the transactions of these parties if any such balance should be found against Haight. The parties themselves having by conclusive acts and agreements, separated these settled accounts and these securities from their other demands; neither party can bring his other demands into examination, in this suit. Haight is precluded by these securities and agreements, from setting off his other demands against Troup, in this suit, but all other rights of Haight concerning those demands, are reserved to him; and his remedies must be sought in some other suit.

I am accordingly, of opinion, that these claims of Haight against Troup, can not be allowed by way of set off, in this suit.

The account upon which the first settlement was made, being open to correction, a reference is made to a master, to examine that account, to rectify all errors which may be found in it, and to state a corrected account. The master will act upon the pleadings and proofs in this cause, and such farther proofs as the parties may give. As this examination takes place in pursuance of the contract of the parties, there is no reason to impose on either of them the burden of proof.

The accounts sent back to the master, to be rectified according to the agreement.

The burden of proof not imposed on either party.

1824.

The usual reference is also made, to ascertain the principal and interest due on the second mortgage.

The complainant relinquishes the agreement for compound interest; and such interest is not to be allowed.